[No. 21116. In Bank.—August 1, 1894.]

EX PARTE SIMON MAIER, ON HABEAS CORPUS.

CRIMINAL LAW—PROTECTION OF WILD GAME—SALE OF MEAT OF DEER KILLED OUT OF STATE.—Under section 626 of the Penal Code, as amended in 1893, it is a misdemeanor to sell, or offer to sell, the meat of any deer, without reference to whether the deer has been killed within or without the state.

ID.—POLICE POWER OF STATE.—It is within the police power of the state, in the protection of the wild game of the state, to prohibit the sale of the meat of any wild game within the state.

ID.—INTERSTATE COMMERCE.—A police regulation making it a public offense to buy and sell deer meat within the state, which is cut from an entire carcass brought from without the state, is not a violation of the con-

stitution of the United States as an attempt to regulate interstate
commerce.

ID.—HABEAS CORPUS—PUBLIC OFFENSE.—Where the complaint under which
a prisoner is held does not state a public offense he is entitled to his
discharge upon *habeas corpus;* but where the complaint states a public
offense the prisoner must be remanded.

HEARING in the Supreme Court upon writ of *habeas
corpus.*

The facts are stated in the opinion of the court.

*Hunsaker, Goodrich & McCutchen,* for Petitioner.

If the facts stated in the complaint do not constitute
a public offense, the petitioner is entitled to his dis-
charge upon *habeas corpus.* (*Ex parte Corryell,* 22 Cal.
179; *Ex parte Kearny,* 55 Cal. 212; *Ex parte Harrold,* 47
Cal. 129.) The deer having been lawfully killed in the
state of Texas, any law passed by the legislature of
this state attempting to prohibit its importation or sale
would be void. (*Bowman* v. *Chicago etc. R. R. Co.,* 125
U. S. 465; *Leisy* v. *Hardin,* 135 U. S. 100; *State* v. *Saun-
ders,* 19 Kan. 127; 27 Am. Rep. 98; *Territory* v. *Evans,*
2 Idaho, 634; *State* v. *I. & O. etc. Gas Co.,* 120 Ind. 575;
*Swift* v. *Sutphin,* 39 Fed. Rep. 630; *In re Christian,* 39
Fed. Rep. 637; *In re Barber,* 39 Fed. Rep. 641; *Harvey* v.
*Huffman,* 39 Fed. Rep. 646; *Ex parte Kieffer,* 40 Fed.
Rep. 399; *Brimmer* v. *Rebman,* 138 U. S. 79; *Railroad Co.*
v. *Husen,* 95 U. S. 465.) Penal statutes should be con-
strued to carry out the obvious intention of the legisla-
ture, and be confined to that. (Sutherland on Statutory
Construction, sec. 354; *Holmes* v. *Paris,* 75 Me. 559;
*Allen* v. *Young,* 76 Me. 80, 83.) As the only purpose of
the statute was the preservation of wild game within the
state, it cannot be held that it was intended by the legis-
lature to prohibit the sale, or the offering for sale, of
the meat of a deer lawfully killed in another state, and
lawfully imported into this state. (*State* v. *McGuire,* 24
Or. 366; *People* v. *O'Neil,* 71 Mich. 325; *Commonwealth*
v. *Hall,* 128 Mass. 410; 35 Am. Rep. 387; *Commonwealth*
v. *Wilkinson,* 139 Pa. St. 304; *Davis* v. *McNair,* 21 Cent.

L. J. 480; Sutherland on Statutory Construction, 449.) Conceding that the state has an interest in the wild game within its territorial limits, and that, by virtue of its police power, it may regulate the manner of killing, or absolutely prohibit the killing or sale of such game, yet it has no power or authority to prohibit the sale of game lawfully killed elsewhere, as the legislature cannot, under the guise of exercising the police power of the state, prohibit or unduly restrict the carrying on of a lawful business. (2 Kent's Commentaries, 8; *In re Jacobs*, 98 N. Y. 98; 50 Am. Rep. 636; *People* v. *Marx*, 99 N. Y. 377; 52 Am. Rep. 34; *People* v. *Gillson*, 109 N. Y. 389; 4 Am. St. Rep. 465; *Mugler* v. *Kansas*, 123 U. S. 661; Tiedeman's Limitation of Police Power, sec. 85; *Ex parte Sing Lee*, 96 Cal. 354; 31 Am. St. Rep. 218; *Ex parte Whitwell*, 98 Cal. 73; 35 Am. St. Rep.152; *People* v. *O'Neil*, 71 Mich. 325; *Leisy* v. *Hardin*, 135 U. S. 100; *Braceville Coal Co.* v. *People;* 147 Ill. 66; 37 Am. St. Rep. 206; *State* v. *Fisher*, 52 Mo. 174, 177; *American Exp. Co.* v. *People*, 133 Ill. 649; 23 Am. St. Rep. 641.)

*District Attorney H. C. Dillon*, and *Deputy District Attorney M. W. Conkling*, for Respondent.

Statutes making the possession of game during the close season punishable by law, no matter where the game is caught, are constitutional. (*Phelps* v. *Racey*, 60 N. Y. 10; 19 Am. Rep. 140; *Magner* v. *People*, 97 Ill. 333; *Roth* v. *State*, 7 Ohio Cir. Ct. 62; *State* v. *Randolph*, 1 Mo. App. 15; *State* v. *Judy*, 7 Mo. App. 524; *State* v. *Farrell*, 23 Mo. App. 176; *American Exp. Co.* v. *People*, 133 Ill. 649; 23 Am. St. Rep. 641; *Gentile* v. *State*, 29 Ind. 409.) The statute is not in conflict with the United States constitution. In this case the whole deer was imported, and after importation the "original package" was broken, and therefore the article ceased to be one affected by the Interstate Commerce Act. (*Leisy* v. *Hardin*, 135 U. S. 100; *State* v. *Kibling*, 63 Vt. 636; *Commonwealth* v. *Schollinberger*, 156 Pa. St. 201; 36 Am. St. Rep.

32; *Commonwealth* v. *Gagne,* 153 Mass. 205; *Commonwealth*
v. *Gay,* 153 Mass. 211.)

VAN FLEET, J.—Petitioner was arrested and is held
in restraint under a warrant issued out of the police
court of the city of Los Angeles, based on a complaint
charging him, under section 626 of the Penal Code,
with unlawfully selling on the eighteenth day of Decem-
ber, 1893, at said city, a quantity of deer meat, which
meat the complaint alleges " was then and there by said
Simon Maier, cut from the carcass of an entire deer,
which said deer had been theretofore brought by said
Simon Maier from the state of Texas, in which state
said deer had been lawfully killed." Petitioner asks for
his discharge on *habeas corpus,* upon the ground that
the complaint does not state a public offense, and, if that
be true, there is no question but that he is entitled to his
discharge in this proceeding. (*Ex parte Corryell,* 22 Cal.
179; *Ex parte Harrold,* 47 Cal. 129; *Ex parte Kearny,* 55
Cal. 212.)

Section 626 is one of the provisions of the Penal
Code for the preservation and protection of the wild
game of this state, and the particular paragraph or sub-
division of the section under which petitioner is charged
(as amended, Stats. 1893, p. 280) reads: "Every person
in the state of California who shall at any time sell, or
offer for sale, the hide or meat of any deer, elk, antelope,
or mountain sheep, shall be guilty of a misdemeanor."
Petitioner contends that this provision of the statute,
properly construed, does not prohibit the sale of deer
meat lawfully taken without the state, but has reference
solely to deer killed within this state; that the law is
intended to protect game within the state, not to pro-
hibit the importation and sale of game from other
states. With this contention we are unable to agree.
It is true the law is intended for the protection of the
game within the state, but it by no means follows from
that fact that it is not the intention, as a means to
accomplish that very end, to prohibit the sale of the

meat of the animals procured elsewhere. The statute is perfectly plain and unambiguous in its terms, and is sufficiently broad and comprehensive to include the inhibited article wheresoever taken or procured. It does not confine itself, in terms or by implication, to the meat of deer killed in this state, but denounces as unlawful the sale of the meat of *any deer;* and there is nothing in the statute tending to give it a more restricted sense. The language is too plain to leave room for construction, and we are not at liberty, even if so disposed, to place a limitation upon the meaning of the legislature which its language will not support. But we have no doubt that the legislature intended exactly what its words import. Aside from the explicit language in which this particular provision is couched, an examination of the various changes which these sections of the code relating to protection of game have undergone at the hands of the legislature is persuasively convincing of the intention to do just what this act does by its terms, entirely prohibit traffic in the meat of these game animals within the state, no matter where killed. And it need hardly be suggested that such a provision, if enforced, will lend great aid to the attainment of the object sought. The facility and ease with which the statutes for the protection of game have been evaded in the past is a matter of common knowledge. Deer and other game have been slaughtered during the close season and foisted upon the market as game procured without the state, and owing to the practical impossibility in the great majority of cases of proving with certainty the source from which it was procured, the attempted enforcement of the statutes for its protection has largely proven abortive. These and like considerations no doubt actuated the legislature in the premises, and induced the enactment of the statute in its present stringent form. And we know of no good reason why it should not be held to mean what it says. Similar statutes in other states have received a like construction. In *Magner* v. *People,* 97 Ill. 331, involving a

statute of Illinois making it unlawful to sell or have in possession quail and certain other game birds during the close season, and which was not in terms limited to birds taken in the state, it was contended, as here, that the statute did not condemn the possession or sale of the birds taken and killed beyond the limits of the state, and shipped into the state for sale. But the court held that the statute must be taken as comprehending within its terms the prohibited game, no matter where taken. It is there said: " But it is argued that this cannot be the fair construction, because such a prohibition does not tend to protect the game of this state. To this there seems to be two answers: 1. The language is clear and free of ambiguity, and in such case there is no room for construction—the language must be held to mean just what it says; 2. It cannot be said to be within judicial cognizance that such a prohibition does not tend to protect the game of this state. It being conceded, as it tacitly is, by the argument, that preventing the entrapping, netting, ensnaring, etc., of wild-fowl, birds, etc., during certain seasons of the year, tends to the protection of wild-fowl, birds, etc., we think it obvious that the prohibition of all possession and sales of such wild-fowl or birds during the prohibited seasons would tend to their protection, in excluding the opportunity for the evasion of such law by clandestinely taking them, when secretly killed or captured here, beyond the state, and afterward bringing them into the state for sale, or by other subterfuges and evasions."

The court of appeals of New York held to the same effect under a statute very like ours, saying: "The penalty is denounced against the selling or possession after that time [close of the open season] irrespective of the place of killing." (*Phelps* v. *Racey*, 60 N. Y. 10; 19 Am. Rep. 140.) In *Whitehead* v. *Smithers*, 2 C. P. Div. 553, Lord Coleridge held that under an English statute for the protection of British game which made it unlawful to sell or have in possession plover during the close season, a party who imported the dead birds from Holland and

CIII. Cal.—31

sold them in the British market came within the prohibition of the statute, and said: " It is said it would be a strong thing for the legislature of the United Kingdom to interfere with the rights of foreigners to kill birds. But it may well be that the true and only mode of protecting British wild-fowl from indiscriminate slaughter, as well as protecting other British interests, is by interfering indirectly with the proceedings of foreign persons. The object is to prevent British wild-fowl from being improperly killed, and sold under pretense of their being imported from abroad." (See, also, *State* v. *Judy,* 7 Mo. App. 524, and *State* v. *Farrell,* 23 Mo. App. 176.)

The cases relied upon by petitioner are clearly distinguishable from the cases referred to above. In most of them, as in *Commonwealth* v. *Hall,* 128 Mass. 410, 35 Am. Rep. 387, and *People* v. *O'Neil,* 71 Mich. 325, the statutes under consideration contained a provision making possession of the game during the close season *prima facie* evidence of a violation of the law, and the construction of the prohibitive features of the statute largely turned upon the effect of that provision. In *Commonwealth* v. *Hall,* 128 Mass. 410, 35 Am. Rep. 387, which is followed by the Michigan case, it is said: " Saying that possession should be *prima facie* evidence necessarily implies that it shall not be conclusive; if the mere possession of birds, during the time within which the taking or killing them is prohibited, of itself constituted an offense under the previous sections of the statute, to say that such possession would be *prima facie* evidence would be superfluous, if not absurd." And it is held that the statute must, therefore, be construed as referring only to game unlawfully taken within the state during the close season. As suggested by counsel for the people, our statute contained a similar provision up to 1883, when the legislature, by an amendment (Stats. 1883, p. 80), eliminated it, thereby evincing an intention to remove from the law any thing calculated to qualify or limit its otherwise plain and explicit terms. We have no doubt that the intention

of section 626 is to prohibit the sale of deer meat brought from without, as well as that taken within, the state.

Nor do we think that in giving the act this effect it contravenes the constitution of this state as being in excess of the police power of the state. The wild game within a state belongs to the people in their collective, sovereign capacity; it is not the subject of private ownership, except in so far as the people may elect to make it so; and they may, if they see fit, absolutely prohibit the taking of it, or any traffic or commerce in it, if deemed necessary for its protection or preservation, or the public good. To this extent it is conceded that the state may go. But it is contended that to go further, and prohibit the sale of game lawfully killed elsewhere and brought here as private property, is in effect to destroy private property, and that this is going beyond a proper exertion of the police power. While it is true that the power to regulate is not the power to destroy, in its absolute sense, it is, nevertheless, true that the right to regulate frequently and as a necessary sequence carries with it the right to so control and limit the use or enjoyment of private property as to amount to its destruction. In the case of *Phelps* v. *Racey*, 60 N. Y. 10, 19 Am. Rep. 140, the same objection was raised, and it is there said: " The objection of a want of power in the legislature to pass the act is not tenable. It is not in conflict with the state constitution within the case of *Wynehamer* v. *People*, 13 N. Y. 378. That case involved the validity of the prohibitory liquor law, and determined that such law, so far as it applied to, and substantially destroyed property in, liquors owned or possessed at the time the act took effect, was in violation of the provision of the state constitution, which declares that no person shall be deprived of life, liberty, or property without due process of law; but impliedly, if not necessarily, it affirmed the power if the law had only applied to liquors subsequently manufactured and acquired. Here the property was acquired subsequent to the passage of the act and with the presumed knowledge of its provisions

and conditions. The legislature may pass many laws the effect of which may be to impair or even destroy the right of property. Private interest must yield to the public advantage. All legislative powers, not restrained by express or implied provisions of the constitution, may be exercised. The protection and preservation of game has been secured by law in all civilized countries, and may be justified on many grounds, one of which is for purposes of food. The measures best adapted to this end are for the legislature to determine, and courts cannot review its discretion."

And these principles have been repeatedly upheld. In some instances their enforcement may work hardship, but we see no such result here. The statute does not prevent a party from importing all the venison he wants for his own use or consumption if he desires to do so. It simply says that for the better protection of the rights of the people in these wild animals, and as a means of preventing their destruction, the meat shall not be a lawful article of sale. There can be no serious injury to any one under such a regulation. If any person imports the meat of the deer into the state, he does it with his eyes open and a knowledge of the purposes for which the law permits it, just as the petitioner did here. Under such circumstances he cannot complain if he is prevented from making a use of the article which the legislature has declared to be detrimental to the well-being of the state. As suggested in *Phelps* v. *Racey*, 60 N. Y. 10, 19 Am. Rep. 140, he acquired the property after the passage of the act, and his rights in it are necessarily subject to the regulations imposed upon its use.

It is further strenuously urged, however, that the act so construed violates the constitution of the United States, in that it is an attempt to regulate interstate commerce—a subject wholly committed to Congress. But after a very careful consideration of the numerous authorities cited in support of this view, we do not think the statute open to this objection. It is true its enforcement may indirectly or incidentally affect, to some extent,

traffic in the inhibited article between the people of this and other states, but that of itself is not sufficient to bring it within the objection urged. The right of the states, under the very comprehensive police power reserved to them under our dual system of government, to regulate and control their own internal affairs, including trade, to the reasonable advantage and good of their people, is conceded and upheld in all the cases in which the questions growing out of the right of the federal Congress to regulate interstate commerce has arisen. The only difficulty has been in defining the limitations of that power. In *Railroad Co.* v. *Husen*, 95 U. S. 470, it is said: "We admit that the deposit in Congress of the power to regulate foreign commerce and commerce among the states was not a surrender of that which may properly be denominated police power. What that power is, it is difficult to define with sharp precision. It is generally said to extend to making regulations promotive of domestic order, morals, health, and safety. As was said in *Thorpe* v. *Rutland & Burlington R. R. Co.*, 27 Vt. 149, 62 Am. Dec. 625: 'It extends to the protection of the lives, limbs, comfort, and quiet of all persons, and the protection of all property within the state according to the maxim, *Sic utere tuo ut alienum non lædas*, which, being of universal application, it must, of course, be within the range of legislative action to define the mode and manner in which every one may so use his own as not to injure others.' It was further said that by the general police power of a state 'persons and property are subjected to all kinds of restraints and burdens, in order to secure the general comfort, health, and prosperity of the state; of the perfect right of the legislature to do which no question ever was, or upon acknowledged principles ever can be, made so far as natural persons are concerned.'" "Many acts of a state [say the court further in that case] may indeed affect commerce, without amounting to a regulation of it in the constitutional sense of the term. And it is sometimes difficult to define the distinction between that which merely affects

or influences and that which regulates or furnishes a
rule for conduct." And in the celebrated cases com-
monly designated as *The License cases*, 5 How. 504, it is
held that the fact that a regulation may incidentally,
and to a certain extent, affect commerce between the
states, does not affect its validity. In *Pierce* v. *New Hamp-
shire* (one of the *License cases*), 5 How. 554, Mr. Justice
Woodbury, in one of the opinions of the majority of the
court, in discussing this power of the states, says: "The
subject of buying and selling within a state is one as
exclusively belonging to the power of the state over its
internal trade, as that to regulate foreign commerce is
with the general government, under the broadest con-
struction of that power." "The idea, too, that a pro-
hibition to sell would be tantamount to a prohibition to
import, does not seem to me either logical or founded
in fact. For even under a prohibition to sell, a person
could import, as he often does, for his own consumption
and that of his family and plantations; and also, if a
merchant, extensively engaged in commerce, often does
import articles, with no view of selling them here, but
of storing them for a higher and more suitable market
in another state or abroad." In the subsequent case of
*Bowman* v. *C. & N. Ry. Co.*, 125 U. S. 465, the same
court held a statute of Iowa, which forbade any common
carrier to bring into the state for any person or corpo-
ration any intoxicating liquors from any state or terri-
tory, void, as being an unwarrantable interference with
interstate commerce, and not a legitimate exercise of
police power, in that it was more than a regulation of
its own internal affairs, or an exercise of the jurisdiction
of the state over persons and property within its limits:
"It is an attempt," say the court, "to exert that jurisdic-
tion over persons and property within the limits of other
states. It seeks to prohibit and stop their passage and
importation into its own limits, and is designed as
a regulation of commerce before the merchandise is
brought to its border. . . . . It is not a regulation con-
fined to the purely internal and domestic commerce of

the state. It is not a restriction which only operates upon property after it has become mingled with, and forms part of, the mass of the property within the state. . . . . But the right to prohibit sales, so far as conceded to the states, arises only after the act of transportation has terminated, because the sales which the state may forbid are of things within its jurisdiction." And it is held that the state cannot, under the guise of a police regulation, prevent the importation of legitimate articles of commerce and trade. And in the later case of *Leisy* v. *Hardin*, 135 U. S. 100, it was held, that it not being within the power of the state to prohibit the importation of lawful commodities, neither can she prohibit the sale by the importer of such commodities upon their receipt by him, since the right to sell any article imported was an inseparable incident to the right to import it. But this right of sale was distinctly limited to the right of the importer to sell or dispose of the article imported in its original, unbroken package or condition as brought by him into the state, and the principle is in that case, as in *Bowman* v. *C. & N. Ry. Co.*, 125 U. S. 465, and the other cases cited distinctly upheld, that the authority of Congress over any article of commerce imported into a state ceases " when the importer has so acted upon it, that it has become incorporated and mixed up with the mass of property in the country, which happens when the original package is no longer such in his hands," and that thereupon the property becomes subject to the jurisdiction of the state, and affected and controlled by its regulations. Tested by these principles we cannot see wherein the statute, applying its provisions to the case made in the complaint, is open to the objection that it attempts to, or does, regulate interstate commerce. Petitioner imported the meat into the state, broke the original package, and put the commodity upon the market. It thereupon became property strictly subject to state regulation and control, and falls within the denunciation of the statute. Whether petitioner could have sold the meat as an entire carcass is a question which does not

confront us, and which it is not, therefore, necessary to determine.

We think the complaint states a public offense, and it follows that the petitioner should be remanded.

It is so ordered.

McFARLAND, J., GAROUTTE, J., HARRISON, J., BEATTY, C. J., and FITZGERALD, J., concurred.

DE HAVEN, J., being absent, did not participate in the foregoing decision.