## 3943. ALLEN *v.* THE STATE.

1. In the exercise of the police power of the State, the legislature may prohibit the killing of wild game or any traffic or commerce in it, if deemed necessary for its preservation or protection, or for the public good, and, to accomplish this end, may make it criminal for any person to sell or offer for sale any of such game, or to have in possession any such game during the closed season, whether the game which he sells or offers for sale, or has in his possession, was killed or taken within or without the State.

2. Under the terms of the act of 1911, commonly known as the· "game law" (Acts 1911, p. 137), it is unlawful to purchase or sell, or offer for sale, in this State at any time any of the game protected by the prohibitory section of the act, or to have in possession any of such game during the closed season specified in the act, without regard to where it was killed or taken, whether within or without the State. The legislature intended, by the explicit and broad provisions of the statute, to insure the preservation and protection of the game there specified within this State, by making the act of selling it or offering it for sale, or having it in possession during the closed season, specific offenses, whether the game was killed or captured within the limits of the State, or elsewhere.

DECIDED APRIL 16, 1912.

Accusation of misdemeanor; from city court of Savannah—Judge Davis Freeman. December 21, 1911.

*Twiggs & Gazan,* for plaintiff in error.

*Walter C. Hartridge, solicitor-general, Morris H. Bernstein,* contra.

HILL, C. J. Allen was convicted on an accusation charging a violation of the game law of this State, as embodied in the act of 1911 (Acts 1911, p. 137), and the case is here on exception to the judgment overruling his motion for a new trial. The ·specific charge against the accused was a violation of section 12 of the act, which makes it a misdemeanor for any person "to purchase or sell, or export for sale, or offer to sell," any of the game birds or animals mentioned in section 11 of the act, and also a violation of section 14 of the act, which makes it a misdemeanor for any person to have in his possession any of the game birds or animals

enumerated in the act, between certain specified dates constituting the closed season. The evidence is not in conflict, and the accused admitted that he sold to the Oglethorpe Club in Savannah, Chatham county, Georgia, on October 2, 1911, "a summer or wood duck," and that on that date (which was within the closed season for wood duck, under the act) he had it in his possession. Among the game birds protected by the provisions of the act (enumerated in section 11) are "summer or wood duck." The defense relied upon was that the summer or wood duck which the accused had in his possession, and sold to the Oglethorpe Club as stated, was killed in the State of South Carolina, where it was entirely lawful for him to kill a wood duck at that time.

The case, on the facts, was submitted to the judge without the intervention of a jury, and he held, that "the purpose of the act of 1911 was to forbid the sale or purchase *at any time,* and the *having in possession during the closed season,* of any of the game birds or animals described in the act, without regard to the place where killed or captured, whether within or without the State." Before coming to the construction of the act in question, certain general principles may be stated that are well settled.

1. From the days of feudalism in England, as well as on the continent of Europe, the right to acquire ownership in game or animals feræ naturæ was recognized as being subject to governmental authority and under its regulation and control. See Geer *v.* Connecticut, 161 U. S. 523 (16 Sup. Ct. 600, 40 L. ed. 794), in which there is a very learned and interesting opinion by the present Chief Justice of the United States Supreme Court. In England the ownership of game is vested in the sovereign power, and individual right thereto has always been held subject either to regulation or restriction. 2 Blackstone's Commentaries, 394, 410; Magner *v.* People, 97 Ill. 333. In the United States the ownership of game is in the people of each State, and no person has any private right in or title to the game, and it is held by the State as the sovereign authority, in trust for all the people in the State. It follows, therefore, that each State has a right to enact such laws for the protection of its game as to it seems best for the accomplishment of that purpose. And this includes the right not only to prohibit the killing or taking of the game by the citizen, but its importation or exportation. Even before the passage of the

act of Congress of May 25, 1900, on this subject, known as the Lacey act (31 Stat. 187), which gave to each State express authority to legislate for the protection and preservation of its game, it was frequently expressly held that provisions in State laws prohibiting the sale of game and its possession out of season was a proper exercise of the police power, and did not deny the due process of law guaranteed by the fourteenth amendment of the Federal constitution, and that provisions of State laws which made their prohibitive terms applicable to game taken in foreign countries, or other States, where it was lawful to take it, and subsequently brought into the State where its sale or possession was forbidden, were lawful. People v. Hesterburg, 211 U. S. 31 (29 Sup. Ct. 10, 53 L. ed. 75), and citations. The cases of Geer v. Connecticut and People v. Hesterburg, supra, so clearly and conclusively settle the unrestricted right of the State to legislate on the subject of its game by virtue of its police power that any further discussion of this feature of the case is deemed wholly unnecessary. Certainly, since the passage of the so-called Lacey act, there can be no question as to the validity of the game statutes in the different States, so far as interstate commerce is concerned.

2. Learned counsel for the plaintiff in error, in his argument and brief, concedes the right of the State to legislate on the subject, but insists that in the enactment of the statute now under consideration the legislature of this State legislated with knowledge of the provisions of the Lacey act, and it is earnestly insisted that the omission by the legislature to expressly prohibit the importation of game into this State from other States or foreign countries was evidence of a legislative purpose not to make such importation unlawful, and that this view of the legislative intent is strengthened by the fact that the statute did expressly prohibit the *exportation* of game. Counsel insists that such a provision can not be properly written into the act of 1911 by judicial construction. In support of this contention, attention is called to the fact that wherever the courts have held that the prohibitory terms of the act apply to game taken or captured without the limits of the State or in foreign countries, the acts in question contained provisions making their prohibitive terms applicable to game killed or captured in foreign countries or other States where the killing or capturing was lawful, and subsequently brought into the State

during the closed season, or sold in the State in which it was imported, in violation of the act. The statute of New York construed in the Hesterburg case, supra, contained a provision as follows: "Wherever in this act the possession of fish or game, or the flesh of any animal, bird, or fish is prohibited, reference is had equally to such fish, game, or flesh *coming from without the State as to that taken within the State.*" Of course, where the legislative intent is thus expressed, there remains no room for judicial construction, but many of the courts of this country and of England, even in the absence of such express provisions, have construed the prohibitive terms of the statute to apply to game lawfully taken or captured in foreign countries or other States, on the theory that such construction is necessary and expedient to carry out the legislative intent for the protection and preservation of the local game of the State. Roth *v*. State, 51 Ohio St. 209 (37 N. E. 259, 46 Am. St. Rep. 566) ; Ex parte Maier, 103 Cal. 476 (37 Pac. 402, 42 Am. St. Rep. 129) ; Stevens *v*. State, 89 Md. 669 (43 Atl. 929) ; Magner *v*. People, 97 Ill. 320. In the Magner case the learned Justice cogently expresses the reason for this construction of game statutes: "It is obvious that the prohibition of all possession and sale of such wild fowls or birds during the prohibitive season would tend to their production, in excluding the opportunity for the evasion of such law by clandestinely taking them, when recently killed or captured here, beyond the State and afterwards bringing them into the State for sale, or by other subterfuges and evasions." It would not be profitable to attempt to reconcile the conflicting views of the courts on this subject. Those interested will find the cases on both sides collated in Ex parte Maier, 42 American State Reports, 138, and Davis *v*. McNair, 21 Central Law Journal, 480.

Looking to the terms of the act itself, we are clear that it was the legislative purpose to prohibit the sale in this State at any time of any of the game or animals enumerated, regardless of the place where killed or captured. The language of the act is explicit and leaves no room for construction, and this court is not at liberty, even if it felt disposed to do so, to place a limitation on the meaning of the legislature, not authorized by the act itself and directly contrary to its express terms. If the lawmakers intended to make it lawful to allow game to be brought into this State and sold here, they would have so declared, for it was matter of great importance.

If they had intended to make the possession of game in this State presumptive evidence of the fact that it was killed in this State, and place the burden of rebuttal upon the accused, they would doubtless have done so. The act of 1903 (Penal Code of 1910, § 592) did make the possession of game prima facie evidence of a violation of the law; but in the game law as enacted in 1911, which this court, in the case of *Hammond* v. *State,* 10 *Ga. App.* 143 (72 S. E. 937), held to have been intended by the legislature as a substitute for all previous or existing laws on the subject, this provision was left out, and the purchase or sale, and the having in possession, during the closed season, of any of the game enumerated in the act were made specific offenses. Even if the language of the legislature was fairly susceptible of two different constructions as to the point now under consideration, we would prefer that which excludes and prevents consequences that would be mischievous in effect or would contravene the manifest purpose of the legislature, which was to protect and preserve the game in the State; and everything contributing thereto would seem to be within the purview of the act. Of course, there is nothing in the act which prohibits the importation of game for the purpose of propagation; indeed, the importation of game for this purpose would be in harmony with the legislative intent, which was to preserve and increase the game in the State. *Judgment affirmed.*