JARVIS B. WOODS *vs.* FRANK M. PERKINS.

Penobscot.    Opinion July 3, 1920.

*Seizure in close time of a carcass of a bull moose under Chap. 131, Public Laws of 1919.*
*The moose was killed legally in another jurisdiction, and transported into Maine.*
*No warrant was ever issued, nor necessary steps taken to determine the ques-*
*tion of forfeiture.    The constitutionality of the act, under which the*
*seizure was made, upheld under the police power of the State.    The*
*failure to have a warrant issued, and an arrest made, and the*
*question of forfeiture determined, is fatal, and the act of*
*seizure a trespass, and the defendant a trespasser*
*ab initio.*

In an action of trover brought to recover the value of a bull moose, lawfully killed by the plaintiff in the Province of New Brunswick and transported thence to Bangor, Maine, where it was seized by the defendant, a duly commissioned and qualified game warden, the court having ordered judgment for defendant and the plaintiff having excepted, it is

*Held:*

1.  That transportation having ceased at the time of the seizure, no question under the Interstate Commerce Act, as to the right to interfere with property in transit, is involved.

2.  That Chap. 131 of the Public Laws of 1919, prohibiting the having in posses-sion except during the last ten days of November, any bull moose, "whenever or wherever taken, caught or killed," includes the having in possession of a bull moose lawfully killed in New Brunswick and afterwards brought into this State.

3.  That the phrase "wherever taken, caught or killed" is unlimited, and was intended to include moose brought into this State from another jurisdiction. The legislative purpose was to prevent evasion of the law on the part of those, especially along the border, who might claim that a moose found in their possession had been killed in another jurisdiction, although in fact killed in this State, thus rendering the enforcement of the law more difficult.

4.  The act in question, in so far as it relates to imported game, is a valid exercise of the police power of the State and is not in violation of the Constitution.

5.  The plaintiff's claim, however, that he has been deprived of his property by the defendant without any judicial determination of his legal right thereto and therefore without due process of law must be upheld.    A warrant for the arrest of the plaintiff should have been obtained by the defendant within a reasonable time after seizure.    The seizure was made on October 15, 1919, and no warrant has ever been issued.    This makes the warden a trespasser ab initio.    He is holding the property without legal authority or justification.

6. Our conclusion therefore is that while the defendant was legally justified in making the original seizure that justification had ceased long before the institution of this suit and he had become liable through his own inaction.

This is an action of trover brought in the Bangor Municipal Court to recover the value of a carcass of a bull moose seized under the provisions of Chapter 131 of the Public Laws of 1919. The moose was lawfully killed in the Province of New Brunswick, and transported, in close time, into Maine to Bangor, where the carcass was seized by the defendant, a game warden. Upon an agreed statement of facts, that court ruled, pro forma, in favor of the defendant, and the plaintiff took exceptions, which were certified directly to the Chief Justice in accordance with the provisions of Private and Special Laws of 1895, Chap. 21. Sec. 6. Exceptions sustained.

Case stated in the opinion.

*George E. Thompson, and James D. Maxwell,* for plaintiff.

*Willis E. Parsons,* for defendant.

SITTING: CORNISH, C. J., SPEAR, HANSON, PHILBROOK, DUNN, MORRILL, JJ.

CORNISH, C. J. Chapter 131 of the Public Laws of 1919, relating to the protection of moose, contains this provision: "No person shall, between the first day of December of each year and the twentieth day of November of the following year, both days inclusive, hunt, take, catch, kill or have in possession any bull moose or part thereof, whenever or wherever taken, caught or killed" &c. By virtue of this section, the defendant, a duly commissioned and qualified game warden, on the 15th day of October, 1919, seized and still holds the carcass of a bull moose which the plaintiff had lawfully killed in the Province of New Brunswick, and had transported and delivered to the Bangor Dairy Company in the City of Bangor, Maine, to be kept in cold storage for him. Transportation had therefore ceased and no question under the Interstate Commerce Act, as to the right to interfere with property in transit is involved.

On December 24, 1919, the plaintiff brought this action of trover in the Bangor Municipal Court to recover the value of the carcass so seized, and that court having ruled in favor of the defendant upon an agreed statement of facts, the case is now before the Law Court upon

the plaintiff's exceptions which have been certified directly to the Chief Justice in accordance with the provisions of Private and Special Laws of 1895, Chap. 21, Sec. 6.

The first point in issue is the scope of the Act of 1919, before quoted. Was it intended by the Legislature to include and does it include a case of this sort where one has in possession during close time, a moose lawfully killed in another jurisdiction and afterwards imported into this State, or should its force be restricted to having in possession in close time a moose unlawfully taken, caught or killed within the limits of the State of Maine? We think the former is the true interpretation of the act. Construing the words "according to the common meaning of the language," R. S., Chap. 1, Sec. 6, Paragraph 1, leads to no other conclusion. The phrase "wherever taken, caught or killed," is unlimited as to space. It includes New Brunswick and New Hampshire as well as Maine. These words either have this meaning or they are meaningless and we are loath to assume that the Legislature had no purpose whatever in inserting them. "Wherever" as construed to mean "wherever within the State of Maine" would be a needless and useless employment of the term, because without it the Act necessarily embraces the entire State.

The history of this particular legislation emphasizes our view. The earlier statutes contained no words which would naturally indicate an intention to cover imported game. Nor did the general revision of the fish and game laws in 1913, which provided for a close time on moose throughout the year with the exception of the month of November, Public Laws 1913, Chap. 206, Sec. 28. In 1915, an absolute close time throughout the entire period until November 1, 1919, was created, the evident purpose being to preserve this diminishing species of game by every means within the power of the Legislature. The general revision of the fish and game laws in 1917, Chapter 219, retained the same provision as to close time until November 1, 1919, and provided for the entire month of November as open time after that date.

Then in 1919 the Legislature made more stringent regulations. The open time was decreased to the last ten days in November and in order to guard against possible evasion of the law when that short November open time should come into vogue, the Legislature passed this act in question, Chapter 131, which was a substitute for R. S., Chap. 33, Sec. 37, and Public Laws 1917, Chap. 219, Sec. 37, and

deliberately inserted the new and sweeping terms "whenever or wherever taken, caught or killed." The obvious purpose of this amendment was not to affect the legality of the taking of game in another State or Province, a purpose quite beyond the power of the Legislature of Maine to effectuate, but to prohibit the possession in this State, during close time, of such game wherever killed, and thus to prevent evasion of the law, on the part of those, especially along the border, who might claim that a moose found in their possession had been killed in another jurisdiction, although in fact killed in this State, thus rendering the enforcement of the law much more difficult. The amendment was simply another step toward the protection of the game within our borders, and its terms are so clear and unambiguous as to really need no construction on the part of the court.

The deer statute was similarly amended many years ago. The original act simply prohibited during close time the killing, destroying or having in possession of more than a certain number of deer, and contained no clause indicating any legislative intent to prevent the possession of deer killed elsewhere. R. S. 1883, Chap. 95, Sec. 4. Public Laws 1891, Chap. 95, Sec. 4. Under the statute in that form our court held that it was not intended to interfere with foreign game brought into the State at any time nor with game lawfully taken or killed here. *State* v. *Bucknam*, 88 Maine, 385, citing with approval *People* v. *O'Neill*, 71 Mich., 325, and *Commonwealth* v. *Wilkinson*, 139 Pa., 298, in which cases statutes of similar import were construed. In the same line are *People* v. *Buffalo Fish Co.*, 164 N. Y., 93; *People* v. *Bootman*, 180 N. Y., 1; *Commonwealth* v. *Hall*, 128 Mass., 410.

Counsel for the plaintiff confidently relies upon *State* v. *Bucknam*, supra as decisive of the case at bar, but as has been seen, that case construed a statute of limited, not unlimited, scope; therefore it cannot be regarded as a precedent here. It is interesting to note that that decision was rendered in 1896, and in 1901 the Legislature amended the deer act so as to expressly extend its range by adding the words "whenever or wherever taken, caught or killed" precisely the same words as were inserted in the moose statute in 1919. Since that amendment to the deer statute the court has had no occasion to pass upon its interpretation.

Some courts have gone so far as to hold that imported fish or game is included within the purview of a statute containing no express provision sufficient to include imported game, as in *State* v. *Shattuck*,

96 Minn., 45; ex parte Maier, 103 Cal., 476; *Roth* v. *State*, 51 Ohio St., 209; *Magner* v. *People*, 91 Ill., 320; *State* v. *Schuman*, 36 Or., 16; *Commonwealth* v. *Savage*, 155 Mass., 278; 13 R. C. L., page 696. But the comprehensive language in the present statute places the construction beyond all doubt, and renders the plaintiff a violator of the law.

In the second place, the plaintiff contends that if the statute as amended applies to imported game it is unconstitutional as depriving the owner of his property.

This contention cannot be upheld. The constitutionality of the entire fish and game law rests upon the police power of the State, and the Legislature may pass all reasonable laws to enforce that power. The fact that some owners of property may be thereby at times restricted in or deprived of its use does not make such laws unreasonable. Such a result is of frequent occurrence. Thus in *Commonwealth* v. *Gilbert*, 160 Mass., 157, an act prohibiting the sale of trout during a certain season, was held to extend to the sale of trout artificially propagated in a private preserve, and to be constitutional as a valid exercise of the police power. The constitutionality of acts applicable to imported game, similar to the one under consideration, is now beyond question. Ex parte Maier, 103 Cal. 476; *Magner* v. *People*, 97 Ill., 320; *Roth* v. *State*, 51 Ohio St., 209; *Stevens* v. *State*, 89 Maryland, 669; *Silz* v. *Hesterberg*, 211 U. S., 31. So far, therefore, as the construction of the statute and its constitutionality, as applied to imported game are concerned, the contentions of the plaintiff cannot be sustained.

But upon another point, the plaintiff's claim must be upheld, namely that he has been deprived of his property by the defendant without any judicial determination of his legal right thereto.

The Declaration of Rights in the Constitution of this State, Const. of Maine, Article I, Section 5, guarantees every person security as to his property, protection against unreasonable searches and seizures, and the right to a fair trial before his property can be lawfully taken and withheld from him. This fundamental principle of civil liberty still subsists and must be jealously guarded by the courts against invasion. That principle was clearly invaded here. A warrant for the arrest of the plaintiff should have been obtained by the defendant either before the seizure was made or within a reasonable time thereafter. The purpose is that the guilt or innocence of the

alleged offender may be judicially determined within a reasonable time. That determination is the principal inquiry. The forfeiture or non-forfeiture of the seized property is but the corollary thereto. Conviction does not follow forfeiture, but forfeiture follows conviction. The statute so provides. Public Laws 1919, Chap. 196, Sec. 32. Hence it is that in such cases the warrant must be obtained with reasonable promptness and the alleged offender given his day in court. Due process of law requires it.

In the case at bar the seizure was made on October 15, 1919, and no warrant has ever been issued. The agreed statement recites that no prosecution has been commenced against the plaintiff for the violation of the game law and that the defendant as a game warden holds the seized game without any warrant or other process whatever, awaiting the determination of the Law Court as to its forfeiture. This statement is fatal to the defense. It makes the warden an acknowledged trespasser ab initio. He is holding the property without any legal authority or justification whatever. *Edson* v. *Crangle*, 62 Ohio St., 49; *Lowry* v. *Rainwater*, 70 Mo., 153; *Russell* v. *Hanscomb*, 15 Gray, 166.

An analogous situation may be found in prosecutions under the prohibitory law. In that class of cases the statute permits the officer to seize liquors without a warrant in the first instance and to keep them "for a reasonable time until he can procure such warrant." R. S., Chap. 127, Sec. 28. In enforcing this statute it was held in *Weston* v. *Carr*, 71 Maine, 356, that an officer who had made a seizure of liquors without a warrant and had delayed six days before procuring one, was liable to the owner as a trespasser, no justifiable reason for the delay being shown. In *State* v. *Riley*, 86 Maine, 144, a similar result followed an inexecusable delay of six days. In the pending case two and one-half months had elapsed after the seizure before the bringing of this civil suit and the defendant had taken no steps whatever toward giving the plaintiff a hearing before a court of competent jurisdiction. This far exceeds any possible limit.

The defendant's contention that the plaintiff ought not to complain because he has not been arrested is untenable. *Adams* v. *Allen*, 99 Maine, 249. When his right to property that has been taken from him depends upon the determination of his guilt or innocence, and that determination can be set in motion only by the seizor, the owner has the constitutional right to a speedy trial. The very foundation

of the forfeiture is a legal seizure. *Guptill* v. *Richardson*, 62 Maine, 257, 265; *State* v. *Ford Touring Car*, 117 Maine, 232.

Nor is the warden protected by the last sentence in the statute under consideration, allowing the owner to recover the seized game by giving a bond to the officer in double the amount of fine for the alleged violation, conditioned that if convicted he will within thirty days thereafter pay such fine and costs. In the first place this presupposes a warrant issued before the bond is given, alleging the offense with which the respondent is charged so that the fine therefor may be ascertained. Here no such charge had been lodged and therefore it would be impossible to know what the terms of the bond should be. But the second and deeper reason is that this provision does not fully safeguard property rights. It may well be that an alleged offender may find himself unable to procure the necessary sureties and to give the requisite bond, in which case the provision affords him no assistance whatever. No unlawful condition or restraint can be imposed upon the constitutional privilege of every person to have his legal rights adjudicated in accordance with the law of the land. *State* v. *Gurney*, 37 Maine, 156; *Saco* v. *Wentworth*, 37 Maine, 165; *Bennett* v. *Davis*, 90 Maine, 102.

Our conclusion therefore is that while the defendant was legally justified in making the original seizure in this case, that justification had ceased long before the institution of this suit, and he had become by reason of his own inaction a trespasser ab initio. Therefore the entry must be,

*Exceptions sustained.*