[Crim. No. 1585. First Appellate District, Division Two.—August 8, 1930.]

In the Matter of the Application of BRYCE FLORENCE for a Writ of Habeas Corpus.

William B. Hornblower and Fabian D. Brown for Petitioner.

Eugene D. Bennett and Ralph W. Scott for Respondent.

NOURSE, P. J.—The petitioner seeks to be discharged from custody following his arrest on a complaint charging a violation of that part of section 628f of the Penal Code which prohibits the shipment of abalone shells out of the state.

A similar application was heard before the Honorable C. J. Goodell, sitting in the Superior Court in the City and County of San Francisco. In remanding the petitioner to custody the learned trial judge rendered a written opinion which fully covers all the issues involved in this hearing and which we adopt in part as the opinion of this court. Judge Goodell's opinion reads:

"Section 628f of the Penal Code prescribes the closed season for pink, red, black and green abalone, and declares fishing for them within such season to be a misdemeanor. It then denounces as a misdemeanor the catching of abalone the shell of which is smaller than the minimum prescribed by statute. It then proceeds:

" 'Every person . . . who by any means whatsoever, takes. or catches any abalone (Haliotis) and does not bring the same naturally attached to the shell and alive, to the shore above high water mark, or who takes, catches or kills any abalone (Haliotis) for other than food purposes, or who, at any time dries any abalones (Haliotis) or who offers for shipment or ships, or receives for shipment or transportation from the State of California to any place in any other state, territory or foreign country any abalone meat or abalone shells, excepting articles manufactured from abalone shells (as a finished product) . . . shall be guilty of a misdemeanor.'

"The states in many cases, in addition to declaring their closed season for different varieties of fish and game, have prohibited the possession of *any* such fish or game (including that caught in other states and brought in) during such closed season. The purpose of fish and game laws being, primarily, as a rule, to conserve the food supply of the particular state, the question naturally arises, How can fish or game so brought in affect such local conservation except beneficially? The courts have uniformly held, however, that such legislation is good, the rationale of the decisions being that these provisions with respect to fish and game imported during the closed season really are in aid of the state's primary purpose, and work out, in the long run, effectively to serve such purpose. This is illustrated by several decisions.

"First is the case of *Ex parte Maier*, 103 Cal. 476 [42 Am. St. Rep. 129, 37 Pac. 402], which seems to be the leading case in this state upon the subject. In that case the petitioner, who sought to be released upon a *habeas corpus*, had brought in from the state of Texas a quantity of deer meat for the purpose of sale in California. The statute of this state prohibited the sale of deer meat, among other things, and it was the petitioner's contention that this prohibition extended only to the meat of deer killed within this state and that the law was intended to protect California game and not to prohibit the importation and sale of game from other states. Judge Van Fleet, in disposing of this contention says:

"'It is true the law is intended for the protection of the game within the state, but it by no means follows from that fact that it is not the intention, as a means to accomplish that very end, to prohibit the sale of the meat of the animals procured elsewhere.'

"And again he says:

"'And it need hardly be suggested that such a provision, if enforced, will lend great aid to the attainment of the object sought. The facility and ease with which the statutes for the protection of game have been evaded in the past is a matter of common knowledge. Deer and other game have been slaughtered during the close season and foisted upon the market as game procured without the state, and owing to the practical impossibility in the great majority of cases

of proving with certainty the source from which it was procured, the attempted enforcement of the statutes for its protection has largely proven abortive. These and like considerations no doubt actuated the legislature in the premises, and induced the enactment of the statute in its present stringent form.'

"The opinion in the Maier case then discusses and reviews the case of *Magner* v. *People*, 97 Ill. 331, involving a statute of Illinois making it unlawful to sell or have in possession quail and certain other game birds during the closed season, and which was not in terms limited to birds taken in the state. It was contended there, as in the Maier case, that the statute meant only birds killed within the state of Illinois, and did not prohibit the sale or possession of birds brought in from outside of the state. And he quotes from the Illinois decision as follows:

"'But it is argued that this cannot be the fair construction, because such a prohibition does not tend to protect the game of this state. To this there seems to be two answers: . . . we think it obvious that the prohibition of all possession and sales of such wildfowl or birds during the prohibited seasons would tend to their protection, in excluding the opportunity for the evasion of such law by clandestinely taking them, when secretly killed or captured here, beyond the state and afterward bringing them into the state for sale, or by other subterfuges and evasions.'"

The leading case on the subject of the power of the state in the conservation of its wild game is *Geer* v. *Connecticut*, 161 U. S. 519, 534 [40 L. Ed. 793, 16 Sup. Ct. Rep. 606], where the Supreme Court said: "The right to preserve game flows from the undoubted existence in the state of a police power to that end, which may be none the less efficiently called into play, because · by doing so interstate commerce may be remotely and indirectly affected. . . . Indeed, the source of the police power as to game birds . . . flows from the duty of the state to preserve for its people a valuable food supply." This power, the court concluded, covered all wild game "which can never be the object of commerce except with the consent of the state, and subject to the conditions which it may deem best to impose for the public good."

In commenting upon the Geer case the federal court, in *In re Deininger*, 108 Fed. 623, said: "The decision is based upon the fundamental distinction that exists between the qualified ownership in game and the perfect nature of ownership in other property. If game when reduced to possession became an article of property, in the ordinary sense of the word, it would belong to commerce; otherwise it is a subject of control by the state, in the exercise of its police power."

We quote again from the opinion of Judge Goodell:

"In the case of *Silz* v. *Hesterberg*, 211 U. S. 31 [53 L. Ed. 793, 29 Sup. Ct. Rep. 10], the petitioner or defendant had been convicted in the courts of the state of New York of the possession of certain grouse caught in Russia and certain plover caught in England, and brought into New York during the season which, under the law of New York, was then closed for grouse and for plover. Again it was contended, as in the Maier and Deininger cases, that the closed season in a given state meant closed only as to fish and game caught within such state, and did not prohibit or prevent the bringing in of game of the same variety legally caught elsewhere. But again the court disposes of this contention on precisely the same grounds as in the other cases. Mr. Justice Day says:

" 'In order to protect local game during the closed season it has been found expedient to make possession of all such game during that time, whether taken within or without the state, a misdemeanor.'

"The justice then goes on to discuss, just as Judge Van Fleet did, the possibility of dealers foisting local or domestic birds onto the public during the closed season under the guise that they were imported birds, and he then says:

" 'The object of such laws is not to affect the legality of the taking of game in other states, but to protect the local game in the interest of the food supply of the people of the state.'

"The case of *Kidd* v. *Pearson*, 128 U. S. 1 [32 L. Ed. 346, 9 Sup. Ct. Rep. 6], is not a fish and game case, but the principle of it is the same as the cases that have been under discussion. The law in that case permitted the manufacture within the state of intoxicating liquors only for certain specified purposes, and it was held that the avowed

object of the law is to prevent not the carrying of intoxicating liquors out of the state, but to prevent their manufacture, except for specified purposes, within the state. Such interpretation would, of course, give to the owner of the liquor manufactured for these purposes only a qualified and limited ownership and not a perfect or unlimited ownership permitting him to put them into commerce generally.

"If the shell of the abalone had no commercial value, but was a useless or waste substance, it might be difficult to find a reason for the nonshipment provision, for such prohibition could in no way aid in the conservation of the meat. But abalone shells are not worthless; they have commercial value. It is common knowledge that they are used for inlaying, as a substitute for mother-of-pearl, and for the manufacture of buttons. Again, the very fact that the petitioner has shipped the shells is some evidence of their commercial value, for he has paid freight charges for their carriage.

"For the past thirteen years section 628f has read substantially as it now reads, although it has gone through successive amendments (Stats. 1917, p. 669; Stats. 1919, p. 518; Stats. 1921, p. 448; Stats. 1925, p. 830; Stats. 1927, p. 1163; Stats. 1929, p. 1556, chap. 782), the only change, so far as this discussion is concerned, is the addition by the 1929 amendment of the words 'as a finished product' after the words 'abalone shells.' During all this time the section has read, and now reads:

" 'Every person . . . who by any means whatsoever, takes or catches any abalone (Haliotis) and does not bring the same naturally attached to the shell and alive, to the shore above high watermark, or who takes, catches or kills any abalone (Haliotis) *for other than food purposes,*' etc., which language recognizes that there is or may be a traffic in the shells themselves, the meat apparently being jettisoned, sacrificed and wasted. The language 'or who takes, catches or kills any abalone *for other than food purposes*' shows that the legislature was apprehensive that somebody, either in or out of the state, might value the shells more than the meat inside of them.

"If the enterprise using or needing abalone shells could lawfully ship them out of the state, it might take them from our waters in large and wholesale quantities and

remove the meat (or edible part) at such place and in such quantities as to leave it unavailable for the people of the state, or not remove it at all until it had ceased to be wholesome, the chief concern being to get the shells and not the meat. Granting that the chief concern of the state is the saving of the meat, it would seem that the provision against shipping the shells outside the state is simply a safeguard invented by the legislature for the purpose of aiding this primary purpose, by removing the temptation to get the shells in large quantities. In the light of the cases which have been discussed, and particularly the Maier, Deininger, Magner and Silz cases, this secondary or auxiliary purpose is readily understandable and easily reconcilable, and it becomes at once rational and defensible.

■ "The petitioner concedes, of course, that the shipment of the abalone meat may be prohibited by the state, 'Conserving it, as the state rightfully may do for the people of this state.' But with respect to the shells counsel strenuously argue that 'if the state ever had the right to conserve for the people of California the abalone shells, this right has been relinquished by permitting the shipment in interstate commerce of shells in manufactured form, and the shells have thereby become a legitimate article of commerce' and no longer subject to state control.

"This argument is an adoption of the reasoning of the Foster-Fountain case, 278 U. S. 1 [73 L. Ed. 147, 49 Sup. Ct. Rep. 1], where Justice Butler says:

" 'But, by permitting its shrimp to be taken and all the products thereof to be shipped and sold in interstate commerce, the state necessarily releases its hold and as to the shrimp so taken definitely determines its control. . . . Those taking the shrimp under the authority of the act necessarily thereby become entitled to the rights of private ownership and the protection of the commerce laws.'

"Indeed, counsel for the petitioner argue that this case is squarely within that case, but in the Louisiana case there is this provision of the statute:

" ' . . . and after the edible portions of the abdomen popular-called tail meat of said shrimp shall have been removed from the shell, within the state of Louisiana, such lawful taker or possessor . . . shall be vested with all the rights and property of the state in and to said shrimp tail

614

meat and shall have the right to sell such shrimp tail meat
or ship the same beyond the limit of the state, without
restriction or reservation.'

"The distinction between the two cases lies in this (quoting again from Justice Butler's opinion):

" 'The conditions imposed by the act upon the interstate movement of the meat and other products of shrimp *are not intended and do not operate to conserve them for the use of the people of the state.*' (Italics mine.) All that the Louisiana statute did was to compel the shelling of the shrimp in Louisiana, leaving the real thing, the edible part, free for shipment anywhere and not requiring its retention for its own people.

"If our California section had provided that after the meat or edible portion of the abalone had been removed *within this state* such meat could be shipped anywhere, without restriction or reservation, the cases would be parallel, for then neither would be aimed at the conservation of food for the people of the state.

"Moreover, the evidence in the Foster-Fountain case showed that 'About 95 per cent of the shrimp obtained from the waters of Louisiana, when taken, is intended for consumption outside the state' and it is interesting to note that the statute did not seek to cut down or change this, but simply to compel such 95 per cent of the catch to be unshelled within the state before it left for consumption elsewhere.

"Judge Rudkin in the Van Camp Sea Food case, 30 Fed. (2d) 111, points out that the real holding of the Foster-Fountain case is summed up in the paragraph which opens with the following sentence:

" 'The facts alleged in the complaint, the details set forth in plaintiff's affidavits and the provisions of the act to be restrained show that the conservation of hulls and heads is a feigned and not the real purpose,' etc., etc., concluding with the part quoted above to the effect that the law was *not* to 'conserve them (shrimp) for the use of the people of the state.'

■ "Finally, is it competent for the legislature to draw a line between abalone shells in the form in which they come out of the water and those transformed into a finished product?

"It has been pointed out that the ownership by a person reducing abalone to possession is but a qualified ownership, subject, under all the decisions, to any conditions which the legislature may reasonably impose. It has been pointed out, also, that the nonshipment condition is (at least as I see it) imposed not to conserve the *shells*, but as a help toward saving *the meat*, as a deterrent, and to discourage what might turn out to be a wanton and ruthless waste and sacrifice of the food within, in the interest of the shell encasing it. It strikes me that if the legislature may do this with respect to *all* shells it may release part of them—those, for instance, that are used in the industry, and, therefore, contribute to the welfare of the state by being manufactured within the state into articles of value and utility.

"But I am satisfied that such partial release does not release all. I am satisfied that there is a justifiable reason for the line thus drawn and that it is neither arbitrary nor unreasonable.

"In the opening brief of the petitioner it is said:

"'Section 628f of the Penal Code does not attempt to conserve for the people of California the abalone shells but permits their manufacture into "finished products," and then in this form there is no restriction or limitation on the power of its owner to ship. Under these circumstances the act is not a regulation under police power but an interference with interstate commerce.'

"It has been already conceded in this memorandum that the act does not attempt to conserve the shells as such.

"Further, at the risk of repetition, because of the qualified nature of the ownership of the abalone meat-and-shell, the shell itself does not take on the attributes of property held in absolute ownership and therefore cannot without the consent of the state pass into and become a part of the general mass of property moveable in commerce.

"It is decidedly settled by all the cases that the police power of a state may be exercised, through fish and game laws, or otherwise, although such exercise may incidentally, indirectly or remotely affect interstate commerce. But from the view I take of the case it seems that this rule is not applicable for the reason that the shells, after the extraction of the meat, cannot pass into commerce at all except those

manufactured. Those that are transformed into finished product are deemed by the legislature to have become something different from an abalone shell, and, as already pointed out, I am satisfied there is a good and reasonable basis for the line drawn between the one kind of shell and the other.''

For the reasons given the petition is dismissed and the petitioner is remanded to the custody of the chief of police of the city and county of San Francisco.

Sturtevant, J., concurred.