[Civ. No. 25044. Fourth Dist., Div. Two. Oct. 5, 1981.]

GARY E. YOUNG et al., Plaintiffs and Respondents, v.
DEPARTMENT OF FISH AND GAME et al., Defendants and
Appellants.

258

COUNSEL

George Deukmejian, Attorney General, R. H. Connett, Assistant Attorney General, and Emil Stipanovich, Jr., Deputy Attorney General, for Defendants and Appellants.

Reid, Babbage & Coil and Richard A. Brown for Plaintiffs and Respondents.

Opinion

ZIEBARTH, J.*—

I

STATEMENT OF THE CASE

This case, which is apparently a case of first impression, involves the validity of regulations adopted by appellant, California Fish and Game Commission (hereinafter referred to as Commission), to regulate commercial activity regarding two species of wildlife (i.e., reptiles and amphibians). The regulations permitted commercial collecting of these two species for scientific and educational purposes, but prohibited such activity for the pet trade. Respondents, who are or were commercial collectors, challenged the regulations (Cal. Admin. Code, tit. 14, §§ 185, 651) which were adopted by the Commission on May 25, 1979, to regulate the commercial take, possession, purchase, sale, transport, export and import of native reptiles and amphibians. Section 185 amended an existing regulation and section 651 was new. Said sections were adopted pursuant to the legislative delegation to the Commission contained in sections 5061 and 6896 of the Fish and Game Code.[1] Respondents also sought an injunction to restrain appellants, California Department of Fish and Game and E. Charles Fullerton, as director (hereinafter collectively referred to as the Department), from enforcing the regulations.

The judgment to which appellants are here objecting ordered a writ of mandamus to issue commanding appellants to allow respondents to continue their business of commercial collecting of reptiles and amphibians in accordance with the regulations *in effect prior* to the adoption of the regulations attacked in this case and further ordered the Department to issue the necessary permits pursuant to those old regulations and not to interfere with respondents' activities except pursuant to any authority which existed under the *old* regulations.

---

*Assigned by the Chairperson of the Judicial Council.

[1]Unless otherwise specified, all statutory references will be to the California Fish and Game Code.

## II

### STATEMENT OF FACTS

Respondents are engaged in small businesses which involve the taking of California native amphibians and reptiles for both commercial and scientific purposes and placing those animals in channels of trade and commerce. Although respondents have been engaged in such activities for several years, it was not until 1975 that there was any effort made by the State of California (through the Department and the Commission) to regulate respondents' activities in any way. As a matter of fact, the sections of the Fish and Game Code which provide for regulation of the taking of amphibians and reptiles in this state were not enacted by the Legislature until 1974.

Commencing in 1975, the Department issued licenses to respondents (except for Kerry Young) and, by agreement between the Department and such respondents and others similarly situated, to permit the taking and dealing in 20 species of reptiles and amphibians out of approximately 200 total of such species then existent in the State of California.

When the Department first implemented regulations requiring licenses, it had no data on which to evaluate whether or not such licensing would benefit native reptiles and amphibians. After the first license provisions were implemented, the Department began collecting data from the licensees concerning the commercial trade in native reptiles and amphibians. The Department was able to conclude (based on the information garnered from the licensed persons, including appellants) that only 6.2 percent of those collecting native species were licensees and that "a large number of California reptiles and amphibians are illegally collected and sold each year."

Based on that conclusion, the Department strongly recommended to the Commission the adoption of regulations to totally prohibit the commercial taking of native amphibians and reptiles.

The administrative record before the Commission shows the following:

Personnel for the Department had long been concerned about commercial exploitation of native populations of reptiles and amphibians. The Department solicited information from herpetologists throughout

the state regarding the impact of commercial collection on native species and prepared a study entitled "An Evaluation of the Status of Commercial Collection of Reptiles and Amphibians in California."

A proposal was formulated by the Department and was presented to the Commission at its February 2, 1979, meeting. Essentially, it proposed banning all commercial collection of native reptiles and amphibians. At the February 2d meeting, the Commission authorized the Department staff to prepare a notice of intent to consider the proposed regulations at its March 2, 1979, meeting.

The March 2, 1979, meeting of the Commission, held in Los Angeles, was attended by a number of persons interested in the proposed regulations. Three representatives of the pet trade and commercial collectors spoke in opposition to the proposal. Two scientists, two representatives of wildlife organizations and two representatives of zoos spoke in support. The pet industry representatives complained that insufficient time had been given to them to study the proposed regulations and formulate a response. The Commission decided to postpone consideration of the regulations until its April 27, 1979, meeting in Sacramento to give these representatives more time.

At the April 27, 1979, meeting nine representatives of the pet industry and the commercial collectors spoke in opposition to the proposed regulations, several at considerable length. A Department staff biologist and a warden spoke in support, as did nine others. Harold Cribbs, then the Commission's assistant executive secretary, stated that the Commission as of that time had received 488 letters, petitions with 199 signatures and 135 cards in support of the regulations and 34 letters in opposition. Although supportive of the proposal, concern was expressed by Commission members that the proposed regulations might deprive legitimate scientific, educational and zoological institutions of specimens needed for educational and research purposes. At the same time, the Commissioners were concerned about the impact that a complete ban on commercial collecting would have on the commercial collectors. Accordingly, the Commission directed the Department to work with representatives of the collectors to fashion regulations that would still allow commercial collecting in response to orders from legitimate scientific, zoological and educational institutions.

The Department met on May 8, with the collectors. Subsequently the Department submitted a revised proposal for consideration at the Com-

mission's May 25, 1979, meeting in El Centro. At the May 25 meeting, after three public hearings, the regulations as revised were adopted. The Department agreed to work with the collectors to develop regulations for breeding of native species.

Representatives of the collectors filed a petition with the Commission challenging the regulations. The petition was denied. This lawsuit followed.

## III

### CONTENTIONS ON APPEAL

A. *Appellants' Contentions*:

1. Reptiles and amphibians are species of wildlife which are included within the terms "fish and game."

2. The Legislature had the power to delegate the regulation of reptiles and amphibians to the Commission.

3. The challenged regulations are within the scope of the specific legislative delegation of power to the Commission.

4. The challenged regulations are not arbitrary or capricious per se.

5. The action of the Commission in adopting the subject regulations was not arbitrary or capricious.

B. *Respondents' Contentions*:

1. Reptiles and amphibians are not species of wildlife which are within the terms "fish and game" as used in article IV, section 20 of the California Constitution.

2. Therefore, the Legislature did not have the power to delegate the power to the Commission to regulate reptiles and amphibians.

3. The challenged regulations are also beyond the scope of the legislative delegation.

4. The subject regulations are arbitrary and capricious per se because they virtually ban all commercial taking of reptiles and amphibians.

5. The action of the Commission in adopting the subject regulation was arbitrary and capricious.

## IV

### ISSUES ON APPEAL

A. Are reptiles and amphibians either "fish" or "game" as those words are used in article IV, section 20 of the California Constitution?

B. Did the Legislature have the power to delegate the regulation of reptiles and amphibians to the Commission?

C. Are the challenged regulations within the scope of the delegation of power to the Commission?

D. Were the actions of the Commission in adopting the challenged regulations arbitrary, capricious or unreasonable?

E. Are the challenged regulations arbitrary, capricious or unreasonable per se because they severely restrict the commercial taking of reptiles and amphibians in California?

## V

### DISCUSSION

To determine whether the challenged regulations are within the scope of the specific legislative delegation to the Commission, we must first trace the source of the Commission's authority and power to enact regulations regarding the wildlife in this state including reptiles and amphibians.

Article IV, section 20[2] of the California Constitution provides in part: "(b) There is a *Fish and Game Commission* of 5 members appointed by

[2]This particular section was added to the Constitution on November 8, 1966, and former section 20 was repealed as of the same date. (Former § 20 is now § 28 of art. IV.) This section was originally adopted by the people of this state as an initiative measure on November 5, 1940 as "Assembly Constitutional Amendment 45" (see "Proposed Amendments to Constitution, Propositions and Proposed Law," Tuesday, Nov. 5, 1940, compiled by Fred B. Wood, legislative counsel).

the Governor and approved by the Senate, a majority of the membership concurring, for 6-year terms and until their successors are appointed and qualified.... The Legislature may delegate to the *commission* such powers relating to the protection and propagation of fish and game as the Legislature sees fit...." (Italics added.)

Pursuant to this enabling provision in the California Constitution, the Legislature has enacted many statutes which have delegated specific powers to the Commission to carry out the constitutional objective of providing for the protection and propagation *of fish and game.* The two statutes that have been enacted to delegate to the Commission the specific power and authority to regulate reptiles and amphibians in this state are sections 5061 and 6896. Those two statutes read as follows:

*Section 5061 of the Fish and Game Code*—"The commission *shall* establish rules and regulations for the commercial take, sale, transport, export, or import of native *reptiles.*" (Italics added.)

*Section 6896 of the Fish and Game Code*—"Except as otherwise provided in this chapter, the commission *shall* establish rules for the commercial take, sale, transport, export, or import of native amphibians." (Italics added.)

The words "native reptiles" as used in section 5061 are defined in section 5060 to mean: "... snakes, lizards, turtles, or any other members of the class reptilia native to California" and the words "native amphibians" as used in section 6896 are defined in section 6895 to mean: "... salamanders, toads, or any other member of the class amphibia native to California."

All four of these statutes were enacted by the Legislature in 1974 as part of chapter 605 of the Statutes of 1974.[3]

Pursuant to the statutory delegations of legislative power granted to the Commission by sections 5061 and 6896 in 1974, the Commission eventually adopted certain regulations on May 25, 1979, the validity of which is the principal issue before this court. Those particular regulations can be found in sections 185 and 651 of title 14 in the California Administrative Code. Those two regulations read as follows: "185.

---

[3]See Statutes of 1974, chapter 605, sections 8, 9, page 1447.

Commercial Take, Possession, Purchase, Sale, Transport, Export or Import of Native Reptiles and Amphibians.

"(a) Except as otherwise provided, no person shall for commercial purposes take, possess, purchase, sell, transport, import or export any native reptile or amphibian or parts thereof.

"(b) The department may issue permits to public or non-profit museums, zoological gardens, or aquaria, or to universities or colleges for the donation, exchange or sale of native reptiles or amphibians or parts thereof between these institutions.

"(c) The department may issue permits to owners of biological supply houses to sell native reptiles and amphibians to scientific or educational institutions, pursuant to section 651 of these regulations."

"651. Commercial Take of Native Reptiles and Amphibians for Scientific or Educational Institutions.

"(a) Native reptiles and amphibians may be sold to scientific or educational institutions only by owners of biological supply houses who have been issued a permit by the department for such purposes.

"(1) Permits shall be issued on an annual basis, commencing April 1 of each year, and expiring on March 31 of the following year, or for the unexpired portion of any permit year commencing April 1.

"(2) To defray costs incurred in the administration of these regulations, a fee of $50 shall be paid to the department by each applicant upon the filing of an application for a permit.

"(3) Applications for a permit to sell native reptiles and amphibians to scientific or educational institutions shall be submitted on forms provided by the department. Applications shall be accompanied by a copy of applicable city or county business permits, and shall include a list of employees or agents authorized by the supply house owner to collect native reptiles or amphibians for the supply house, pursuant to these regulations.

"(b) Field Collecting Permit. Native reptiles and amphibians may be taken for sale to scientific or educational institutions only by owners of

biological supply houses who have been issued a permit by the department pursuant to subsection (a) above, and by authorized employees or agents of such biological supply houses, only under authority of a field collecting permit issued by the department.

"(1) The department may issue a field collecting permit to an owner of a biological supply house upon receipt by the department of the original copy of a written request for purchase from a faculty or staff member of a scientific or educational institution, accompanied by a statement from the supply house owner indicating (A) the name of the owner, authorized employees, or agents who will collect the specimens requested; (B) the species and number of each species the owner or each employee or agent will collect; and (C) the estimated beginning and ending dates of such collecting.

"(2) The field collecting permit shall indicate the names of those authorized to collect the specimens requested by the scientific or educational institution.

"(3) The field collecting permit shall indicate the maximum number of each species requested by the scientific or educational institution that the supply house is authorized to collect and possess.

"(4) The field collecting permit shall indicate the inclusive dates during which collecting of the specimens requested by the scientific or educational institution is authorized, and the date by which such specimens shall be shipped.

"(5) Specimens collected pursuant to a field collecting permit may be held only on the premises of a biological supply house following expiration of the authorized collecting period, but shall not be held on the premises of the supply house later than the authorized shipping deadline.

"(c) Each owner, employee, or agent of a biological supply house collecting under authority of this section, shall have in his possession, in addition to his own copy of a field collecting permit, a copy of the permit issued to the biological supply house pursuant to Section 651(a) of these regulations, and, if amphibians are to be collected, a valid commercial fishing license.

"(d) Each owner, employee, or agent of a biological supply house collecting under authority of a field collecting permit shall collect only those species and numbers authorized by the field collecting permit. Any species possessed in the field that is not authorized by the field collecting permit shall be considered to have been collected for commercial purposes and shall be a violation of these regulations.

"(e) Delivery.

"(1) All deliveries or shipments of reptiles or amphibians taken under authority of this section shall be accompanied by the original copy of the field collecting permit issued to the supply house owner. Shipments via the U.S. Postal Service or private carrier shall have this document attached to the outside of the shipping container, which shall be labeled: 'Live Reptiles/Amphibians—Handle With Care'.

"(2) Possession by the scientific or educational institution of the original copy of the field collecting permit, which accompanies the shipment or delivery of the reptiles or amphibians taken pursuant to this section, shall constitute authority for the scientific or educational institution to possess the specimens purchased pursuant to this section.

"(f) Methods of Take.

"(1) Amphibians shall be taken only by hand or by a dip net.

"(2) Reptiles shall be taken only by hand or by the following hand-operated devices: (A) Lizard nooses, (B) Snake tongs, (C) Snake hooks.

"(3) It is unlawful to use crowbars, tire irons, jack-hammers, winches, explosive devices, or any other method or means of collecting that involves removal or breaking apart of rocks, granite flakes, or other shelters in or about which reptiles or amphibians may be found.

"(4) It is unlawful to take reptiles or amphibians by means of pit-traps or can-traps.

"(g) Closures.

"(1) No reptiles or amphibians may be taken from within the boundaries of State Parks or National Parks or Monuments, including public roadways therein.

"(2) No reptiles or amphibians may be taken from within the boundaries of ecological reserves designated by the Commission, including public roadways therein.

"(3) No garter snakes (*Thamnophis* sp.) may be taken in San Mateo County.

"(h) The supply house owner shall be responsible for compliance by its employees or agents with these regulations. The department may refuse to authorize owners, employees, or agents of biological supply houses to collect or sell native reptiles or amphibians upon conviction of a violation of these regulations by a court of competent jurisdiction.

"(i) Any permit issued pursuant to these regulations may be cancelled or suspended at any time by the commission for cause after notice and opportunity to be heard, or without a hearing upon conviction of a violation of these regulations by a court of competent jurisdiction."

The respondents have challenged the subject regulations first of all on the ground that the Legislature did not have the power to delegate the regulation of reptiles and amphibians to the Commission.

As noted above, article IV, section 20 (formerly § 25-1/2) created the "Fish and Game Commission" back in 1940. The section specifically gave the Legislature the authority to delegate to the Commission "such powers relating to the protection and propagation of *fish* and *game* as the Legislature sees fit." (Italics added.) Respondents contend and the trial court also found that amphibians and reptiles are not "fish and game" as those words have been traditionally considered in this state and therefore amphibians and reptiles are not "fish and game" as those words were used in article IV, section 20 (formerly § 25-1/2) when the Fish and Game Commission was first established in this state by an initiative measure in 1940. Respondents therefore claim that the Legislature exceeded its constitutional authority when it enacted sections 5061 and 6896. We disagree.

In interpreting article IV, section 20 of the California Constitution (hereafter section 20), this court must liberally construe the section to advance or extend the purpose of the section. In discussing the first paragraph of section 20 (which is not involved in the present case), the

California Supreme Court held that the section was remedial in character in *In re Makings* (1927) 200 Cal. 474 [253 P. 918]. The court (at pp. 478-479) said that: "This section of the constitution is remedial in character and should be given a liberal construction. 'It is well settled that *a remedial statute must be liberally construed, so as to effectuate its object and purpose.* Although due regard will be given the language used, such an act will be construed, when its meaning is doubtful, so as to suppress the mischief at which it is directed, and to advance or extend the remedy provided, and bring within the scope of the law every case which comes clearly within its spirit and policy. Clearly, the remedial effect of provisions should not be impaired by construction, ...' (23 Cal.Jur. 801.) In construing this section of the constitution the court should consider the subject matter with which it deals in its endeavor to ascertain the true meaning of the language used." (Italics added.)

That said subdivision (b) of section 20 (the paragraph with which we are here concerned) *is also remedial* is clear from the ballot argument submitted to the people before the election. The argument in favor of the proposition provided:

"Argument in Favor of Assembly Constitutional Amendment No. 45

"It has long been apparent to conservationists, lovers of nature and sportsmen throughout California that definite and immediate action must be taken to revamp the constitutional set-up of our Fish and Game Commission in order to maintain for ourselves, and to pass on to our posterity, an adequate and reasonable supply of *wildlife fish and game* ....

"California is a rapidly growing State and as it grows and develops, demand becomes greater upon our wild-life resources, while the area and natural facilities for the propagation and maintenance of wild-life, fish and game is consistently diminishing. The necessary steps must, therefore, be taken to produce fish and game more abundantly in this restricted area and also at a price which will permit the citizens in every walk of life to continue to enjoy the great outdoor sports which are naturally and characteristically American. This is the primary purpose of the aforesaid Constitutional Amendment.

"This proposition is a modified form of the Model Fish and Game Commission as outlined by the International Association of Game, Fish

and Conservation Commissioners and adopted at their 28th convention in September, 1934, and subsequently approved by the American Game Association and American Fishery Society. It has since been adopted, in a form modified to meet local conditions by some twenty States of the Union.

"The Hawes Committee consisted of leading conservationists, biologists, fish and game administrators from the entire North American Continent. Much thought was given by the Committee to the model set-up and this proposition which is a modified form thereof, is as nearly perfect as possible.

"This *proposition will remove the Fish and Game Commissioners from political influence by*:

"1. Providing a nonsalaried board of five commissioners;

"2. Appointment of commissioners for staggered terms so that no one administration can dominate the commission. This avoids a sudden reversal of policy;

"3. The Governor's appointments of commissioners are to be confirmed by the Senate which will nullify poor appointments.

"This proposition will give an *opportunity to the Division of Fish and Game to manage the wild-life resources of the State on a basis of sound scientific and factual knowledge by*:

"1. Allowing Legislature to delegate regulatory powers to the commission so that regulations may be based on scientific knowledge rather than on supposition and hearsay from self-interested pressure groups.

"2. *Allowing the commission to establish and follow through long term policies and plans for scientific fish and game management.*

"3. Allowing the commission to employ and retain thoroughly trained personnel so that the management policies of 'sustained yield without endangering future supply' may be effectively carried through.

"This is the most progressive fish and game proposition ever offered to the electorate of the State." (Italics added.)

In interpreting section 20, the foremost duty of this court is to determine the intent of the section. (*Kaiser* v. *Hopkins* (1936) 6 Cal.2d 537, 538 [58 P.2d 1278].) In interpreting the section, the object sought is a very important factor. (*San Francisco* v. *San Mateo* (1941) 17 Cal.2d 814, 818 [112 P.2d 595].) The printed ballot arguments may be used to determine the object and intent. (*Story* v. *Richardson* (1921) 186 Cal. 162, 165 [198 P. 1057, 18 A.L.R. 750]; see *Cudahy Packing Co.* v. *Johnson* (1939) 12 Cal.2d 583, 589 [86 P.2d 348].)

The above quoted ballot argument makes it clear that the constitutional amendment was to protect the wildlife of the State of California. Its purpose was to remove the old Fish and Game Commission from political influence but not to in any way decrease the Commission's powers. In applying the rules of construction set forth above, section 20 should be construed liberally and in such a way to uphold the Legislature's authority to delegate to the Commission the power of regulation over all wildlife in this State. Given the varying meanings of fish and game discussed below, this court interprets the terms as including amphibia and reptilia. These species are clearly wildlife and now also need protection. To interpret section 20 in the narrow fashion as the court below did, would be to frustrate the intent of the Legislature in proposing the constitutional amendment.and the voters who adopted the amendment.

Other factors also lead to this same conclusion. As discussed above, there is no indication of any intent to curb the previous powers of the Commission set forth in the Fish and Game Code. There were several statutes in effect *prior to the adoption of the amendment* which regulated reptiles and amphibians. For example:

(1) Former sections 1350-1352 (amphibians-frogs) (enacted in 1933).

(2) Former section 1400 (desert tortoises) (enacted in 1939).

Further, it has been held that "[w]here two constructions can be placed upon a constitutional amendment and the legislature has enacted a law placing a reasonable construction upon the amendment, the courts will ordinarily follow the legislative construction." (*Kaiser* v. *Hopkins, supra*, 6 Cal.2d 537, 540.) Further, when an interpretation is set forth soon after the passage of a law when the circumstances are well known, considerable weight should be given that interpretation.

(2A Sutherland, Statutory Construction (4th ed. 1973) § 49.08, pp. 255-256.)

Sections 15.1, 15.3 and 15.4 of the former Fish and Game Code of 1933 (added in 1945) all gave the Commission the authority to regulate amphibians and reptiles. In 1941, the Legislature passed former section 13 providing that the Commission should administer the Fish and Game Code and have all the same powers as the old Commission. As shown above, these powers included the authority to regulate reptiles and amphibians.

With reference to the dictionary and statutory definitions of the terms in question, an examination of the definitions of the terms "fish," "game," "amphibian" and "reptile" shows that amphibians and reptiles are included in the general phrase of "fish and game."

Fish has been defined in several different ways including, "[l]oosely, *any animal* habitually living in the water." (Funk & Wagnalls, Standard College Dict. (1973) (italics added.)

Game has also been defined in various ways, such as, (1) "[a]nimals under pursuit or taken in hunting" (Webster's Third New Internat. Dict. (unabridged 1966)), and (2) "[c]ollectively, animals, birds or fish that are hunted or taken . . . ." (Funk & Wagnalls, Standard College Dict., *supra.*) Thus, the terms fish and game cover a wide variety of species of animals. The terms, taken together, cover almost all types of wildlife. Using even the narrowest definitions of reptiles and amphibians, that is, "amphibians are defined as a class of vertebrate animals whose young usually have gills and live in water and later develop lungs, and reptiles are defined as any group of cold-blooded vertebrates that move on their bellies as snakes by means of small, short legs" (Webster's Unabridged Dict.), these species are covered by the phrase "fish and game." They are both wild animals taken from the wild. Also, amphibians have gills at some point in their life cycle and live in water.

Further, "fish" has long been defined in the Fish and Game Code as including amphibians. Section 2, subdivision (h) of the former Fish and Game Code of 1933, enacted before the constitutional provision here in question was passed by the voters, defined "fish" as follows: "'Fish' means fish, mollusks, crustaceans or *amphibia*, including the spawn or ova thereof, whole or parts thereof." (Italics added.) In the present Fish

and Game Code, amphibia was dropped from the definition of fish in 1957.[4] However, it was added back in a 1969 amendment.[5] Therefore, the Legislature has considered amphibia as being within the definition of fish almost continuously since at least 1933.

The word "game" apparently has never been defined in the Fish and Game Code, and we, therefore, have no statutory definition of that term.

The term "game" has been defined to include "all animals ferae naturae of both land and sea whose taking for the purpose of recreation or food is regulated by the game laws." (34 Cal.Jur.3d, Fish and Game, § 1, pp. 90-92.)

We therefore hold that the phrase "fish and game" as used in section 20 of article IV of the California Constitution is broad enough to include reptiles and amphibians. To interpret section 20 in any other manner would mean that a significant portion of the wildlife of this state might not be subject to the regulation of the Commission. That was not the apparent intention of the majority of the voters of this state in 1940 when they passed the initiative measure which became section 20 of article IV of our California Constitution.

We agree, however, with another finding made by the lower court to the effect that even if reptiles and amphibians for some reason are not included in the terms "fish" and "game" that "[t]he legislature has the authority to grant powers and place additional duties on the COMMISSION in addition to those existing in the statute or constitutional section which created the COMMISSION. [¶] It is a general rule of administrative law that 'there are no restrictions on the power of the legislature to assign new functions to an administrative agency.' (2 Cal.Jur.3d, Administrative Law, § 16, p. 231.) Therefore, the Legislature in this case could validly decide to place upon the Commission the duty to regulate commercial activities dealing with reptiles and amphibians. This the Legislature did in sections 5061 and 6896 of the Fish and Game Code."

We therefore hold that the statutory delegation of legislative power through the enactment by the Legislature was clearly within its constitutional authority.

---

[4]See Statutes 1957, chapter 456, section 45, page 1309.

[5]See Statutes 1969, chapter 689, section 1, page 1357.

■ The next question we must decide then is whether the challenged regulations are within the scope of the specific legislative delegation to the Commission.

The trial court itself in this case raised the question as to the power of the Commission to enact a complete ban upon the commercial collecting of reptiles and amphibians as part of its statutory delegation to regulate these species. The court subsequently found that, since the regulations would put respondents out of business, a complete ban had been enacted and that this was not within the delegation of authority by the Legislature.

The court's finding that the regulations would put the respondents out of business cannot stand. The record is completely devoid of any evidence to support such a finding. In any case, that finding does not prove that a complete ban had been adopted. The regulations are applicable to all persons and not limited to the particular individuals involved. Further, no person has a vested right to collect the wildlife of this state. The trial court recognized both of these facts. There was no evidence presented as to the effect of the regulations on others. Therefore, the fact that some individuals might be put out of business does not lead to the conclusion that the regulations have completely banned commercial collecting and that all collectors will be put out of business. This was never considered below and the court, therefore, erred in equating its finding as to the individual respondents with a complete ban.

Further, the evidence introduced and the wording of the regulations themselves (which we have quoted above) show that a complete commercial ban was not adopted by the Commission. The regulations only prohibited *one* portion of commercial collecting activity. Section 185, subdivision (c) prohibited commercial collecting for the *pet industry* only.

It specifically provides that: "The department may issue permits to owners of biological supply houses to sell native reptiles and amphibians to scientific or educational institutions, pursuant to Section 651 of these regulations." Section 651 deals with the manner in which the commercial dealing for scientific and educational purposes is to be carried out.

Permits could therefore be issued to collectors *to sell* to scientific or educational institutions. The Commission decided on the basis of the

evidence before it that the capture of wild reptiles and amphibians *for sale as pets* was damaging to the resource and of little public benefit. However, it did not entirely prohibit commercial collecting.

"Commercial" means activities carried out "from the point of view of profit: having profit as the primary aim." (Webster's Third New Internat. Dict. (unabridged 1966) p. 456.) The ability to supply and sell reptiles and amphibians to the thousands of colleges, universities, high schools, zoological gardens, etc., *is a commercial purpose.* The regulations *do not* require these institutions to collect these animals for themselves at no profit, but rather clearly provide that *collectors may sell to those institutions.*

As the record demonstrates, the Department originally proposed an absolute ban. However, at its April 27, 1979 meeting, the commissioners expressed concern both as to the difficulty such a ban might pose for scientific research and the burden it placed on the commercial collectors. Considerable discussion was devoted to this problem. The Commission directed the Department to prepare regulations that would permit limited collecting for educational and research purposes, which it did.

As discussed above, the regulations adopted did just that.

Even assuming, arguendo, that the Commission had adopted a complete ban on commercial collecting of reptiles and amphibians, it would have been within its delegated authority. There is no indication in sections 5061 and 6896 which evidences any intent of the Legislature to withhold any of its authority in this field when it delegated the authority to the Commission to adopt the questioned regulations. The Legislature must be presumed to know the extent of its power, and by not qualifying the grant, by the plain meaning of the statutes it has granted the Commission all of the power which it has. Stated another way, since there are no statutory limitations, the Commission's actions, which are legislative in character, are subject to the same tests of validity as the acts of the Legislature. (*Knudsen Creamery Co.* v. *Brock* (1951) 37 Cal.2d 485, 494 [234 P.2d 26].)

The trial court interpreted sections 5061 and 6896 as containing limitations on the delegation of power to the Commission and discussed three other sections of the Fish and Game Code to bolster its ruling

that the Legislature did not intend to delegate to the Commission the power to completely ban commercial activities in regard to reptiles and amphibians. The trial court stated: "The Legislature has, in some instances (i.e., frogs for commercial purposes per Section 6851, and tortoises per Section 5000, and 'fully protected reptiles' per Section 5050), indicated that it does intend, except as permitted by the regulations of the Commission, to wholly forbid either commercially or completely the taking of certain wild life." We find that the reliance by the trial court on these other sections as justification for its ruling was misplaced.

First, the finding quoted above recognizes that some of those sections do not completely ban commercial taking. For instance, section 6851 permits such taking *pursuant to regulations* of the Commission. Section 5000 allows a taking *pursuant to permit* by the Department. The only section that contains a complete ban is section 5050, which generally prohibits the taking of fully protected reptiles and amphibians for any purpose including both sport and commercial purposes. However, section 5050 is not particularly helpful as to what the Legislature intended when it enacted sections 5061 and 6896, the sections with which we are here concerned. Certainly the Legislature could consider certain species to be so clearly endangered that it should not allow any taking, sport or commercial, except for "necessary scientific research."

Why the Legislature elected to treat certain reptiles and amphibians (frogs in § 6851 and tortoises in § 5000) differently than the remainder of the species as to commercial dealing is not clearly stated in the Fish and Game Code. However, it is noted that both of those species have long been regulated; frogs since 1933 and tortoises since 1939 (see Historical Notes to §§ 6851 and 5000, 31 West's Ann.Cal. Codes, pp. 259, 338), whereas the general regulations of commercial uses of all reptiles and amphibians did not begin until 1974.

It therefore appears that regarding the desert tortoise (§ 5000), fully protected reptiles and amphibians (§ 5050), and frogs (§ 6851), the Legislature had sufficient evidence and experience to deal with them separately by statute. As to the remainder of native reptiles and amphibians, the Legislature delegated its authority over commercial taking (§§ 5061, 6896) as it previously had its authority over sport taking (§ 205), committing the regulation of commercial exploitation of those species to the expertise and sound discretion of the Commission, as pro-

vided for in article IV, section 20 of the California Constitution. Indeed, that was the intent of the constitutional amendment which added that section to the Constitution. This is similar to the Legislature's delegation of discretion to the Commission to designate endangered species (§ 2050 et seq.), and to designate species which cannot be imported into the state except by permit (§ 2118, subds. (i), (j)). Thus the fact that the Legislature may have designated certain species of reptiles and amphibians as fully protected from both the sport and commercial take does not diminish the delegation of power to the Commission to fully regulate the commercial taking of other native reptiles and amphibians, including the power to prohibit their taking and sale for pets, in sections 5061 and 6896. In short, there is nothing in those sections to suggest that in delegating its power to the Commission to "regulate" commercial trafficking in native reptiles and amphibians, the Legislature was not delegating all of its power, *including the power to prohibit commercial exploitation of these species.* Further, nothing elsewhere in the Fish and Game Code suggests anything to the contrary.

Such a complete delegation from the Legislature to the Commission was permitted by article IV, section 20 of the California Constitution. The Legislature's power to regulate the wildlife in this state is extensive and that power to regulate includes the power to prohibit.

The case of *Ex Parte Maier* (1894) 103 Cal. 476 [37 P. 402], is a landmark case in this field. In that case the Legislature had banned the sale of deer meat in this state. Former section 626 of the Penal Code provided: "Every person in the state of California who shall at any time sell, or offer for sale, the hide or meat of any deer, elk, antelope, or mountain sheep, shall be guilty of a misdemeanor." The court held that the statute prohibited the sale of such meat no matter where the meat was procured, in the state or out of the state. The intent of the law was to protect game within the state, and it was reasonable for the Legislature to ban all sales because, among other things, of the ease with which the statutes for the protection of game have been evaded. (*Ex Parte Maier, supra*, 103 Cal. 476, 480.)

In the *Maier* case the court stated (at p. 483), that *"The wild game within a state belongs to the people* in their collective, sovereign capacity; *it is not the subject of private ownership, except in so far as the people may elect to make it so; and they may,* if they see fit, *absolutely prohibit the taking of it, or any traffic or commerce in it,* if deemed

necessary for its protection or preservation, or the public good. To this extent it is conceded that the state may go. But it is contended that to go further, and prohibit the sale of game lawfully killed elsewhere and brought here as private property, is in effect to destroy private property, and that this is going beyond a proper exertion of the police power. While it is true that the power to regulate is not the power to destroy, in its absolute sense, it is, nevertheless, true that the *right to regulate frequently and as a necessary sequence carries with it the right to so control and limit the use or enjoyment of private property as to amount to its destruction.*" (Italics added.)

In the much more recent case of *Adams* v. *Shannon* (1970) 7 Cal. App.3d 427 [86 Cal.Rptr. 641], the Commission enacted a complete ban on the importation of piranha into the State of California. The *Adams* court held that such a complete ban was within the delegated power of the Commission. (See also *Andrus* v. *Allard* (1979) 444 U.S. 51 [62 L.Ed.2d 210, 100 S.Ct. 318].)

From the above it becomes clear that regulation, by both the Legislature and the Commission, may include the power to completely ban an activity relating to wildlife and, therefore, the Commission, in its regulation of the commercial activity regarding reptiles and amphibians, had the delegated authority to completely ban such activities if it determined that such action was necessary.

■ As to the last issue of whether the regulations were unreasonable and adopted in an arbitrary or capricious manner, we note that the trial court held that the actions of the Commission were not arbitrary.

■ In *Adams* v. *Shannon, supra*, 7 Cal.App.3d 427, 433, the Court of Appeal articulated the test as follows: "In the case of an exercise of the state police power in a fashion designed to protect the natural environment, the test is not whether there is a clear and present danger to the environment which justifies the legislation. The test is rather whether the legislative body could have determined upon any reasonable basis that the legislation is necessary or desirable for its intended purpose."

■ The record in this case shows that the Commission fully considered a great deal of evidence which was presented to it by both proponents and opponents of the regulations and had a reasonable basis for adopting the challenged regulations.

Prior to the adoption of the regulations here challenged, the Commission held three public hearings on this matter at which evidence was heard including testimony from herpetologists. A report by the Department of Fish and Game entitled "An Evaluation of the Status of Commercial Collecting of Reptiles and Amphibians in California," was presented to the Commission. In support of the regulations, the Commission received 488 letters, petitions with 199 signatures and 135 cards; 34 letters were received in opposition. Copies of this material were sent to the commissioners before they took any action.

The Department's belief that these regulations were needed for enforcement purposes is a sufficient basis for the regulations, even standing alone. The basis for the statute considered by the reviewing court in the case of *Ex Parte Maier, supra,* 103 Cal. 476, was that the fish and game statutes were easily evaded and a complete prohibition of the sale of any deer meat would make it easier to enforce those laws. This was upheld as a reasonable basis for the statute.

A recent United States Supreme Court case also supports this view. In *Andrus* v. *Allard, supra,* 444 U.S. 51, regulations of the Secretary of the Interior which prohibited commercial transactions in parts of birds *legally* killed before they came under the protection of relevant statutes were challenged. The high court upheld the validity of those regulations. The court stated (at p. 58 [62 L.Ed.2d at p. 218]) that: "It was *reasonable* for Congress to conclude that the possibility of commercial gain presents a special threat to the preservation of the eagles because that prospect creates a powerful incentive both to evade statutory provisions against taking birds and to take a large volume of birds." (Italics added.) The respondents in *Andrus* contended that the goal of preventing evasion of the statute could have been achieved by means less onerous than a general sales ban. At this point, the court noted: "Moreover, even if there were alternative ways to insure against statutory evasion, Congress was free to choose the method it found most efficacious and convenient. '[T]he legislature ... is authorized to pass measures for the protection of the people ... in the exercise of the police power, and is itself the judge of the necessity or expediency of the means adopted.' [Citation.]" (*Andrus* v. *Allard, supra,* 444 U.S. 51, 58-59 [62 L.Ed.2d 210, 218-219], fn. omitted.) The court also recognized that a flat prohibition on the sale of wildlife is a valid, traditional conservation technique, and "a traditional legislative tool for enforcing conservation policy." (*Andrus* v. *Allard, supra,* 444 U.S. 51, 61 [62 L.Ed.2d 210, 220].)

The rationale of the decision of the United States Supreme Court in the *Andrus* case is as applicable to this case as it was to a congressional act. Thus, both the *Maier* and *Andrus* decisions upheld enforcement goals as reasonable bases for conservation regulations. It was also a reasonable basis for the Commission's decision in adopting the regulations in question in this case.

The record in this case makes it clear that the finding by the trial court that the Commission was not arbitrary in adopting the challenged regulations was correct. We find that the action by the Commission was also not capricious.

Also, as respondents admit and the trial court found, the Commission's action in adopting the challenged regulations was quasi-legislative. Therefore, the regulations are valid if they are: (a) within the granted power, (b) issued pursuant to proper procedure, and (c) reasonable. (1 Davis, Administrative Law Treatise (1958) § 5.03, p. 299.) (5) In determining whether a regulation is reasonable, judicial review is limited to an examination of the proceedings before the Commission to determine whether its actions were arbitrary and capricious, or entirely lacking in evidentiary support. (*Pitts* v. *Perluss* (1962) 58 Cal.2d 824, 833 [27 Cal.Rptr. 19, 377 P.2d 83]; *Vita-Pharmacals, Inc.* v. *Bd. of Pharmacy* (1952) 110 Cal.App.2d 826, 832-833 [243 P.2d 890].)

■ A regulation is presumed to be valid, and therefore the party challenging the regulation has the burden of proving unreasonableness. (*Freeman* v. *Contra Costa County Water Dist.* (1971) 18 Cal.App.3d 404, 408 [95 Cal.Rptr. 852].) As the trial court below recognized, "It matters not, therefore, whether the court may agree with the action taken by the Fish and Game Commission." In weighing the reasonableness of agency actions, courts "'will not substitute their judgment or notions of expediency, reasonableness or wisdom for those which have guided the agency.'" (*Faulkner* v. *Cal. Toll Bridge Authority* (1953) 40 Cal.2d 317, 329 [253 P.2d 659], quoting 2 Cal.Jur.2d 361, § 219.) In *Faulkner* the court reiterated the high burden with which respondents approach the court: "'The findings and the determination come before the reviewing court with a strong presumption as to their correctness and regularity. ■ Thus, it is presumed, in the absence of evidence establishing ... the contrary, that the necessary facts to support the determination were ascertained and found, that the agency duly considered the evidence adduced at the administrative hearing, that official

duty was regularly performed, and that the agency applied the proper standard or test in reaching its decision.'" (*Id.*, at p. 330, quoting 2 Cal.Jur.2d 355-356, § 216.)

We find that based on the record before us, the respondents have failed to meet the burden imposed on them under the law of proving that the regulations in question were unreasonable under the facts and circumstances in this case. Therefore, the presumption of validity is applicable.

## VI

### SUMMARY OF CONCLUSIONS

For the reasons discussed at length above, we have concluded as follows:

A. That the source of the general authority of the Legislature to delegate its authority and power to provide for the protection and propagation of "fish and game" in California is article IV, section 20 of the California Constitution.

B. That the phrase "fish and game" as contained in section 20 of article IV is broad enough to include in its definition the species of wildlife known as "reptiles" and "amphibians" as those terms are used in sections 5061 and 6896, respectively, of the California Fish and Game Code.

C. That the enactment by the Legislature in 1974 of said sections 5061 and 6896 was a proper exercise of the authority conferred on it by section 20 of article IV of the California Constitution.

D. That the regulations are within the scope of the authority delegated to the Commission and are also reasonable and apparently necessary based on the evidence that was presented to the Commission.

E. That the adoption of the regulations in question by the Commission was not done in an arbitrary or capricious manner.

F. That sections 185 and 651, title 14, California Administrative Code are valid and enforceable.

The judgment of the lower court is hereby reversed with directions that said judgment be vacated and the injunctive relief and writ of mandamus which the lower court granted be dissolved forthwith.

Kaufman, Acting P. J., and McDaniel, J., concurred.